F I L E D
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

OCT 13 2021

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | No. | 3:21-CR-00171 |
| v. | ) | | |
| | ) | 18 U.S.C. § 2 | |
| | ) | 18 U.S.C. § 371 | |
| [1] FADEL YASER ALSHALABI | ) | 18 U.S.C. § 1347 | |
| | ) | 18 U.S.C. § 1349 | |
| [2] EDWARD D. KLAPP | ) | 42 U.S.C. § 1320a-7b(b)(1)(A) | |
| | ) | 42 U.S.C. § 1320a-7b(b)(2)(A) | |
| [3] MELISSA L. CHASTAIN | ) | | |
| a/k/a "Lisa Chastain" | ) | JUDGE RICHARDSON | |

# SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times material to this Superseding Indictment:

1. The Medicare Program ("Medicare") was a federal health care program that provided benefits to individuals who were sixty-five years of age or older, or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. The Medicaid Program ("Medicaid") was a federal and state funded health care program providing benefits to people who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. Medicaid was administered pursuant to Title XIX of the Social Security Act. CMS was responsible for overseeing the Medicaid program in participating states. The benefits available under

Medicaid were governed by federal statutes and regulations, and by rules implemented by the individual states. Individuals who received benefits under Medicaid were commonly referred to as Medicaid "beneficiaries."

3.  Medicare and Medicaid were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b) and "federal health care program[s]" as defined in Title 42, United States Code, Section 1320a-7b(f).

4.  Medicare programs covering different types of benefits were separated into different program "parts." For example, "Part A" of the Medicare program covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies, "Part B" covered medical services by laboratories and physicians and is described in more detail below, "Part C," also known as "Medicare+Choice" and "Medicare Advantage" is described in further detail below, and "Part D" covered prescription drugs.

5.  Physicians, clinics and other health care providers, including laboratories, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services or items provided to beneficiaries.

6.  A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known

2

either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## PART B COVERAGE AND REGULATIONS

7.     "Part B" of the Medicare Program was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

8.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

9.     Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Colorado, Delaware, Louisiana, Maryland, Mississippi, New Jersey, New Mexico, Oklahoma, Pennsylvania, Texas, and Washington, D.C. Palmetto GBA ("Palmetto") was the MAC for the consolidated Medicare jurisdictions that included Alabama, Georgia, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia.

10.     To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are

available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

11.     CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

12.     Payments under Medicare Part B could be made directly to the health care provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## THE MEDICARE ADVANTAGE PROGRAM

13.     The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided Medicare beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, including health maintenance organizations ("HMOs"), provider sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS"), rather than through the original Medicare program (Parts A and B).

14.     Private health insurance companies offering Medicare Advantage plans were required to provide Medicare beneficiaries with the same services and supplies offered under Parts A and B of Medicare. To be eligible to enroll in a Medicare Advantage plan, a person had to have been entitled to benefits under Part A and Part B of the Medicare Program.

15.     A number of companies, including Aetna, Inc. ("Aetna"), UnitedHealth Group, Inc. ("UnitedHealth"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("WellCare") and CVS

Health Corporation ("CVS Health"), along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to Medicare Advantage beneficiaries through various plans.

16.    Medicare Advantage plans, including Aetna, UnitedHealth, Humana, WellCare and CVS Health were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

17.    The health insurance companies, through their respective Medicare Advantage programs, often made payments directly to physicians, medical clinics, laboratories, or other health care providers, rather than to the Medicare Advantage beneficiary that received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

18.    To obtain payment for services or treatment provided to a beneficiary enrolled in a Medicare Advantage plan, physicians, medical clinics, laboratories, and other health care providers had to submit itemized claim forms to the beneficiary's Medicare Advantage plan. The claim forms were typically submitted electronically via the internet. The claim form required certain important information, including the information described above in Paragraph 6.

19.    When a provider submitted a claim form to a Medicare Advantage program, the provider party certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program, including the Anti-Kickback Statute. The submitting party also certified on claim forms that the services being billed were medically necessary and were in fact provided as billed.

20.    The private health insurance companies offering Medicare Advantage plans were paid a fixed rate per beneficiary per month by the Medicare program, regardless of the actual

5

number or type of services the beneficiary received. These payments by Medicare to the insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage plan, regardless of whether or not the beneficiary utilized the plan's services that month. CMS determined the per-patient capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each patient's previous illness diagnoses and treatments. Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

21.    Medicare Part B and Medicare Advantage plans are collectively referred to as "Medicare" herein.

## GENETIC TESTING

22.    Cancer genomic ("CGx") testing was a test that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

23.    Pharmacogenetic ("PGx") testing was a test that detected specific genetic variations in genes that impacted the metabolism of certain medications. In other words, PGX testing helped determine, among other things, whether certain medications would be effective if used by a particular patient.

24.    Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(l)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment

or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(l). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

25.     If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. In particular, "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." Title 42, Code of Federal Regulations, Section 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

26.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

27.     In submitting claims to Medicare, providers used a variety of Current Procedural Terminology "CPT" codes to indicate what CGx or PGx testing (collectively, "genetic testing") had been performed.

### **TELEMEDICINE**

28.     Telemedicine provided a means of connecting patients to doctors and other medical providers by using telecommunications technology, to interact with a patient.

29.     During the timeframe of the conspiracy described below, Medicare covered expenses for specified telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a licensed medical provider's office or a specified medical facility - not at a beneficiary's home - during the telehealth consultation with a remote provider.

30.     Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed medical provider and were reasonable and necessary to diagnose and treat a covered illness or condition.

## THE DEFENDANTS AND RELATED INDIVIDUALS

31.     **[1] FADEL Y. ALSHALABI** was a resident of Waxhaw, Union County, North Carolina.

32.     Crestar Labs LLC, was a limited liability company organized under the laws of Tennessee with its principal place of business at 2001 Campbell Station Parkway, Suite C-2, Spring Hill, Tennessee 37174. **[1] ALSHALABI** registered Crestar Labs LLC with the Tennessee Secretary of State on or about 2014.

33.     Karemore Labs was a laboratory at 12091 Somerset Avenue, Princess Anne, Maryland 21853. **[1] ALSHALABI** acquired Karemore Labs in approximately January 2019. Karemore Labs was also known as Crestar Labs, Inc.

34.     On or about July 2019, **[1] ALSHALABI** also acquired laboratories in Texas, including Martis Analytics and Diagnostics LLC, also known as Crestar Labs LLC Texas, and

Fortis Diagnostics, also known as CrestarDX, both of which were located at 1651 N. Collins Blvd., Richardson, Texas 75080.

35.     The headquarters for the Crestar-associated laboratories described above (collectively, "Crestar Labs") was the Spring Hill, Tennessee, location, located within the Middle District of Tennessee.

36.     Crestar Labs was an enrolled Medicare provider and purported to be a laboratory for genetic testing services.

37.     [1] **ALSHALABI** controlled a Tennessee limited liability company called Stars Holding, LLC, with a principal executive office in Charlotte, North Carolina. [1] **ALSHALABI** utilized Stars Holding, LLC to purchase laboratories. [1] **ALSHALABI** was the sole member and Chief Executive Officer of Stars Holding, LLC.

38.     At all times relevant, [1] **ALSHALABI** was the owner, operator, and Chief Executive Officer of Crestar Labs, at times through Stars Holding, LLC.

39.     [2] **EDWARD D. KLAPP** was a resident of Jupiter, Florida, and employed as Vice President of Sales for Crestar Labs starting on or about January 2018 through on or about December 2019.

40.     Co-Conspirator #2 was a resident of Easley, South Carolina, and employed as Director of Client Services, and at times, Vice President of Operations for Crestar Labs. Co-Conspirator #2 also performed billing services for Crestar Labs from a separate company. Co-Conspirator #2 was associated with, or employed by, Crestar Labs starting on or about October 2018 through on or about January 2020.

41.     Employee #1 was an employee of Crestar Labs in Spring Hill, Tennessee, and the Technical Supervisor for Genetics.

42. **[3] MELISSA L. CHASTAIN,** a/k/a "Lisa Chastain," was a resident of Belton, South Carolina, and was the owner and Chief Executive Officer of DNA Project Consulting LLC d/b/a Genetix LLC ("Genetix"), a marketing company based in Belton, South Carolina, that contracted with Crestar Labs to provide Crestar Labs with genetic testing samples from Medicare and Medicaid beneficiaries starting on or about November 2018 through on or about January 2020.

43. Co-Conspirator #3 was a resident of Greenville, South Carolina, and was the President of Genetix, LLC.

44. Crestar Labs, through **[1] ALSHALABI, [2] KLAPP**, and co-conspirators contracted with various co-conspirator marketing companies (the "Marketing Companies") to obtain genetic testing samples from Medicare and Medicaid beneficiaries, including the following:

   a. Genetix was a purported marketing company owned by **[3] CHASTAIN** and based in South Carolina that identified and solicited beneficiaries to receive genetic testing;

   b. Marketing Company #2 was a purported marketing company based in Florida that identified and solicited beneficiaries to receive genetic testing;

   c. Marketing Company #3 was a purported marketing company based in Georgia that operated under two different company names and identified and solicited beneficiaries to receive genetic testing;

   d. Marketing Company #4 was a purported marketing company based in Maryland that identified and solicited beneficiaries to receive genetic testing;

   e. Marketing Company #5 was a purported marketing company based in Florida that identified and solicited beneficiaries to receive genetic testing;

f.  Marketing Company #6 was a purported marketing company based in Florida that identified and solicited beneficiaries to receive genetic testing;

g.  Marketing Company #7 was a purported marketing company based in Utah that identified and solicited beneficiaries to receive genetic testing;

h.  Marketing Company #8 was a purported marketing company based in Florida that identified and solicited beneficiaries to receive genetic testing;

i.  Marketing Company #9 was a purported marketing company based in Colorado that identified and solicited beneficiaries to receive genetic testing; and

j.  Marketing Company #10 was a purported marketing company based in Ohio that identified and solicited beneficiaries to receive genetic testing.

45.  The Marketing Companies entered into agreements with various co-conspirator companies who purported to provide telemedicine services (the "Telemedicine Companies") to pay for and obtain orders for genetic tests for Medicare beneficiaries to send to Crestar Labs, including the following:

a.  Telemedicine Company #1 was a purported telemedicine company based in Florida that paid medical providers to sign orders for genetic testing;

b.  Telemedicine Company #2 was a purported telemedicine company based in South Carolina that paid medical providers to sign orders for genetic testing;

c.  Telemedicine Company #3 was a purported telemedicine company based in Kentucky that paid medical providers to sign orders for genetic testing; and

d.  Telemedicine Company #4 was a purported telemedicine company based in Texas that paid medical providers to sign orders for genetic testing.

## COUNT ONE

46. Paragraphs 1 through 45 are re-alleged and incorporated by reference as though fully set forth herein.

47. From on or about July 2017 and continuing through on or about February 2020, in the Middle District of Tennessee and elsewhere, **[1] ALSHALABI, [2] KLAPP**, and **[3] CHASTAIN** did willfully and knowingly combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, including Co-Conspirator #2, the Marketing Companies, and the Telemedicine Companies: to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare and Medicaid program, and to commit certain offenses against the United States, that is:

    a. knowingly and willfully offering and paying remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part a Federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A);

    b. knowingly and willfully offering and paying remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, or item

for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B);

c. knowingly and willfully soliciting and receiving remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

d. knowingly and willfully soliciting and receiving remuneration, including kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B).

## PURPOSE OF THE CONSPIRACY

48. It was the purpose of the conspiracy for **[1] ALSHALABI** and his co-conspirators, including **[2] KLAPP**, **[3] CHASTAIN**, Co-Conspirator #2, the Marketing Companies, the Telemedicine Companies, and others known and unknown to the Grand Jury, to unlawfully enrich themselves and others by, among other things:

a. offering, paying, soliciting, and receiving kickbacks and bribes in return for recruiting and referring Medicare and Medicaid beneficiaries for genetic testing to Crestar Labs;

b. offering and paying kickbacks and bribes to marketers, including the Marketing Companies, in return for marketers recruiting, recommending and referring Medicare and Medicaid beneficiaries to obtain genetic material for genetic testing kits and to sign medical documentation;

c. offering and paying kickbacks and bribes to telemedicine companies, including the Telemedicine Companies, to obtain doctors' orders for genetic testing for beneficiaries;

d. submitting and causing the submission of claims to Medicare and Medicaid for genetic tests;

e. concealing kickbacks and bribes;

f. concealing the submission of false and fraudulent claims to Medicare and Medicaid; and

g. diverting proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## MANNER AND MEANS

49. The manner and means by which **[1] ALSHALABI, [2] KLAPP, [3] CHASTAIN**, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

50. It was part of the conspiracy that Crestar Labs was an enrolled and participating provider in Medicare, through **[1] ALSHALABI**, who certified to Medicare that Crestar Labs

would comply with all Medicare rules and regulations, and federal laws, including that he would refrain from violating the federal Anti-Kickback Statute, which prohibited the knowing and willful payment of kickbacks or bribes to induce or reward patient referrals involving any item or service payable by federal health care programs, and that Crestar Labs would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare.

51.     It was further part of the conspiracy that **[1] ALSHALABI** acquired a number of additional laboratories in order to utilize different National Provider Identifier numbers to obtain Medicare and Medicaid payment for Crestar Labs' claims for genetic testing.

52.     It was further part of the conspiracy that **[1] ALSHALABI,** on his own and through employees of Crestar Labs, including **[2] KLAPP** or Co-Conspirator #2, paid kickbacks and bribes to **[3] CHASTAIN**, the Marketing Companies, and others, in exchange for the recruitment and referral of Medicare and Medicaid beneficiaries that **[3] CHASTAIN** and the Marketing Companies referred to Crestar Labs for genetic testing, without regard to the medical necessity of the tests.

53.     It was further part of the conspiracy that **[3] CHASTAIN** and the Marketing Companies solicited and received kickbacks, including from **[1] ALSHALABI** and **[2] KLAPP**, in exchange for recruiting and referring Medicare and Medicaid beneficiaries to Crestar Labs, knowing that Crestar Labs would bill Medicare and Medicaid for genetic testing purportedly provided to the recruited beneficiaries, without regard to the medical necessity of the tests.

54.     It was further part of the conspiracy that **[1] ALSHALABI**, on his own and through employees of Crestar Labs, including **[2] KLAPP** or Co-Conspirator #2, entered into contracts or agreements with **[3] CHASTAIN** and the Marketing Companies, that disguised kickbacks and bribes as payments from the laboratories for marketing services.

55.    It was further part of the conspiracy that **[3] CHASTAIN** and the Marketing Companies paid their field marketers or sales representatives to directly recruit Medicare and Medicaid beneficiaries to provide samples of their genetic material to the marketer for genetic testing and to sign documentation provided by the marketer or sales representative.

56.    It was further part of the conspiracy that **[3] CHASTAIN** and the Marketing Companies recruited Medicare and Medicaid beneficiaries at senior fairs, nursing homes, low-income housing, door-to-door at beneficiary residences, and other locations, and induced them to accept genetic tests regardless of the fact that these tests were not routinely covered by Medicare or Medicaid and without regard to whether the tests were medically necessary.

57.    It was further part of the conspiracy that **[3] CHASTAIN** and the Marketing Companies used the recruited Medicare and Medicaid beneficiary information to generate genetic testing orders by inputting the recruited Medicare and Medicaid beneficiary information into Crestar Labs' requisition order forms, or providing the information directly to the Telemedicine Companies.

58.    It was further part of the conspiracy that **[3] CHASTAIN**, and the Marketing Companies, obtained signed orders for genetic tests for the recruited Medicare and Medicaid beneficiaries by paying the Telemedicine Companies kickbacks and bribes for signed orders by doctors or other medical providers ("doctors' orders") that ordered the genetic testing for Medicare and Medicaid beneficiaries without regard to the medical necessity of the test and even though the medical providers were not the treating physician for the beneficiaries, were not treating the beneficiaries for cancer or symptoms of cancer, did not use the results in the treatment of the beneficiaries, did not conduct a proper telemedicine visit, and often never communicated with the beneficiaries at all.

59.     It was further part of the conspiracy that on occasion, **[1] ALSHALABI, [2] KLAPP**, Co-Conspirator #2, and others at Crestar Labs, obtained the doctors' orders, that were procured through the payment of kickbacks, directly from the Telemedicine Companies.

60.     It was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP**, Co-Conspirator #2, and others at Crestar Labs, used the genetic testing samples and medical documentation obtained from the beneficiaries by the Marketing Companies, as well as the doctors' orders, to submit or cause the submission of claims to Medicare and Medicaid for genetic tests.

61.     If was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP**, and their co-conspirators tracked the number of referrals sent by the Marketing Companies, including **[3] CHASTAIN**, the amount of the kickback payments to the Marketing Companies, and the Medicare or Medicaid reimbursement for each referral.

62.     It was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP**, and their co-conspirators accepted sham invoices from the Marketing Companies that made it appear as if the Marketing Companies provided hourly services by specific rate, as a means to conceal the true nature of the kickbacks and bribes.

63.     It was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP**, and their co-conspirators accepted sham invoices from the Marketing Companies that made it appear as if the Marketing Companies provided services via a flat fee, when in reality the amount of the kickback and bribes was determined by the number and value of referrals, as a means to conceal the true nature of the kickbacks and bribes.

64.     It was further part of the conspiracy that **[1] ALSHALABI, [2] KLAPP**, and their co-conspirators submitted, or caused to be submitted, approximately $86 million in claims to

Medicare, including through a billing company operated by Co-Conspirator #2, for the genetic tests obtained through kickbacks and bribes and without regard to whether the tests were medically necessary or eligible for reimbursement.

65.     It was further part of the conspiracy that as a result of these claims, Medicare paid Crestar Labs at least approximately $13.9 million.

66.     **[1] ALSHALABI**, **[2] KLAPP**, and other co-conspirators used the fraud proceeds received from Crestar Labs to benefit themselves and others, and to further the fraud.

## OVERT ACTS

67.     In furtherance of the conspiracy, and to accomplish its objects and purposes, at least one of the co-conspirators committed, or caused to be committed, in the Middle District of Tennessee and elsewhere, at least one of the following overt acts, among others:

A.     On or about October 13, 2017, **[1] ALSHALABI** emailed a group of investors in Crestar Labs and stated, "[t]he lab has already started receiving DNA samples from the group in Florida that is estimated to reach a thousand samples in the next 60 days. In March I was able to create and support this group with an office and training including financial needs and now this group is sending accounts every week with DNA samples.";

B.     On or about June 27, 2018, a principal of Marketing Company #2 emailed **[1] ALSHALABI** to propose an increase to Marketing Company #2's "commission" rate from Crestar Labs from 30% to 45% and to reduce the per-sample Cost of Goods deduction. Marketing Company #2 further stated "[f]irst thing that is paid is cost of goods to cover the labs cost for any work done. Then the revenue share to [Marketing Company #2] of what is left over is 45%";

C.     On or about September 12, 2018, **[1] ALSHALABI** emailed an employee

of Crestar Labs requesting a calculations sheet for "commissions" for August. The sheet indicated the amount owed to Marketing Company #2 based on the 45% of revenue amounted to $11,779.05;

D. On or about September 17, 2018, Marketing Company #2 emailed **[1] ALSHALABI** and an employee of Crestar Labs a sham hourly invoice for the same period of time in August and in the amount of $11,779 that purported to represent services by the hour at $250 per hour;

E. On or about September 17, 2018, **[1] ALSHALABI** instructed Crestar Labs Employee #1 and **[2] KLAPP** by email to move Crestar Labs from Telemedicine Company #2 to Telemedicine Company #3;

F. On or about November 28, 2018, Crestar Labs Employee #1 introduced Dr. S.A. directly to Telemedicine Company #3 about "coming aboard.";

G. In or about November 2018, Crestar Labs, through the signature of **[2] KLAPP**, contracted with Genetix, through the signature of **[3] CHASTAIN**, to conduct marketing services through the use of independent contractor sales representatives;

H. On or about December 3, 2018, Crestar Labs Employee #1 introduced **[3] CHASTAIN** and Genetix to Telemedicine Company #3 and stated "She is working with Crestar and wishes to utilize [Telemedicine Company #3] for her teleconsulting needs ....";

I. On or about January 13, 2019, **[3] CHASTAIN** emailed Telemedicine Company #3 regarding their contract negotiation and stated "Any mention of referral needs to be taken out and some other terminology put in to protect us both.";

J. On or about January 29, 2019, **[3] CHASTAIN**, on behalf of Genetix, and Telemedicine Company #3 executed an agreement. In the Fees section of the agreement,

the terms stated that Genetix would compensate Telemedicine Company #3 "the price per referral." The payment schedule stated: "Fee per referral of $160.";

K.    On or about February 20, 2019, a representative of Telemedicine Company #1 sent a text message to Co-Conspirator #2 stating "Are those GA forms ready?" On or about February 25, 2019, Co-Conspirator #2 responded by text message with a link to a dropbox.com folder labeled "Crestar GA 2-23-19" and stated, "I have a couple hundred more to drop for you today.";

L.    In or about March 2019, Marketing Company #3 referred Medicare beneficiary J.K. to Crestar for CGx testing:

        i.    The signed doctor order for the CGx test came from a telemedicine company, with the signature of Dr. J.A.;

        ii.    In or about June 2019, **[1] ALSHALABI** and **[2] KLAPP** caused Crestar to submit approximately $8,100 in claims to Medicare for CGx testing purportedly rendered to Medicare beneficiary J.K., of which Medicare paid approximately $3,423;

        iii.    In or about August 2019, **[1] ALSHALABI** caused a payment to be made in the amount of $70,000 to Marketing Company #3;

M.    In or about March 2019, **[3] CHASTAIN**, through her marketing company Genetix, referred Medicare beneficiary M.W. to Crestar for CGx testing:

        i.    The signed doctor order for the CGx test came from Telemedicine Company #3, with the signature of Dr. S.A.;

        ii.    In or about June 2019, **[1] ALSHALABI** caused Crestar to submit approximately $13,478 in total claims to Medicare for CGx testing

purportedly rendered to Medicare beneficiary M.W., of which Medicare paid approximately $5,383;

    iii. In or about August 2019, **[1] ALSHALABI** caused a payment to be made in the amount of $70,000 to Genetix;

N.     On or about April 17, 2019, Telemedicine Company #3 sent an invoice to **[3] CHASTAIN**. The invoice listed a quantity of 640 at a rate of $160 for a total amount owed of $102,400.00;

O.     On or about April 18, 2019, **[3] CHASTAIN** emailed Telemedicine Company #3 about the April 17th invoice and stated: "We still have 217 applications still waiting on Dr's signatures. Believe me I want to be able to pay you now but we can't simply because we still haven't been paid by the lab."

P.     On or about April 26, 2019, an owner of Marketing Company #4 sent an email to **[1] ALSHALABI**, **[2] KLAPP**, Co-Conspirator #2, and another owner of Marketing Company #4 and stated, "We had several meetings and discussions about our marketing practices. Crestar knew everything we did. . . . Your group knew everything we did and gave guidance all along. You knew we paid people for survey's.";

Q.     In or about April 2019, Crestar Labs, through **[1] ALSHALABI, [2] KLAPP**, and Co-Conspirator #2 terminated the relationship with Marketing Company #4 purportedly based on Marketing Company #4's marketing practices;

R.     On or about May 17, 2019, **[2] KLAPP** sent an email to **[3] CHASTAIN** regarding genetic testing samples sent by Genetix, copying **[1] ALSHALABI**, and stated "[w]e understand your frustration with not being able to get your samples processed and paid in a timely manner . . . we advanced you $50K last week against your current billed

samples so you could pay some of your reps.";

S.      On or about May 17, 2019, **[3] CHASTAIN** sent an email to **[2] KLAPP**, Co-Conspirator #2 and others and asked **[2] KLAPP** to call Telemedicine Company #3 to tell them to "keep processing our swabs until we get paid . . . they would get paid as soon as we did. I have already paid them for 29 consults for the money that we received from the lab for the 50,000." **[2] KLAPP** responded "Money's coming honey..";

T.      On or about May 21, 2019, Co-Conspirator #3 at Genetix sent an email to **[1] ALSHALABI** and **[2] KLAPP**, and Co-Conspirator #2, with **[3] CHASTAIN** copied, regarding the terms of a new contract, and stated that the "flat-fee payment" needed to be "more in line with our volumes" and Genetix had "only been paid $50K on over 1200 submitted samples. . . .";

U.      On or about May 21, 2019, Co-Conspirator #3 at Genetix emailed **[1] ALSHALABI**, **[2] KLAPP**, and Co-Conspirator #2, with **[3] CHASTAIN** copied, and complained about "not being paid on any of our samples" and stated "we need to be paid fairly for our volumes – past and future.";

V.      On or about June 2019, after the same owners of Marketing Company #4 changed the company name and resumed marketing services to recruit Medicare beneficiaries, Crestar Labs, through **[1] ALSHALABI**, **[2] KLAPP**, and Co-Conspirator #2, re-engaged Marketing Company #4 under a new name;

W.      On or about June 14, 2019, Co-Conspirator #2 emailed **[1] ALSHALABI**, **[2] KLAPP,** and **[3] CHASTAIN** with an Excel file attached tracking the samples to date from Genetix. The email stated:

- 116 Samples Paid to date
- $306,294.34 Collected

- 1,029 samples billed to date
- 913 samples pending at insurance

Later that same day, Co-Conspirator #2 sent an updated Excel file with the patient names included for tracking the swabs. The vast majority were listed as Medicare beneficiaries;

X.      On or about June 25, 2019, **[2] KLAPP** sent an email to **[1] ALSHALABI** and Co-Conspirator #2, stating:

"Please share some good news today with regard to getting paid from Medicare…

I'm getting bombarded until 11pm last night from:
[Owner of Marketing Company #9]
Lisa Chastain
[Owner of Marketing Company #6]
[Principal of a Marketing Company]
[Owner of Marketing Company #8]
[Owner of Marketing Company #3]
[Owner of Marketing Company #5];

Y.      On or about June 26, 2019, **[3] CHASTAIN** forwarded an email from one of Genetix's sales representatives to **[1] ALSHALABI**, **[2] KLAPP**, and Co-Conspirator #2 stating "[p]lease get the money in the bank or we are all going to be in trouble." The forwarded email was from a sales representative stating that she was "owed for six swabs" and threatening to go to the Alabama Secretary of State if she was not paid;

Z.      On or about July 28, 2019, **[1] ALSHALABI**, **[2] KLAPP**, Co-Conspirator #2, and others had an ongoing email exchange with Marketing Company #5 with the subject line from Marketing Company #5 as "Please Pay Us So We Can Put This To Rest." One part of the email chain states in part, from **[2] KLAPP**: "You will [b]e paid as we get paid on your samples. You do have access to your portal so you can see the status of your samples.";

AA.     On or about August 12, 2019, **[1] ALSHALABI**, **[3] CHASTAIN**, and Co-

Conspirator #2 discussed their ongoing business and specifically discussed how doctors' orders for genetic testing were obtained. During that discussion, **[3] CHASTAIN** stated, in sum and substance, that Telemedicine Company #3 was automatically approving doctors' orders for genetic tests without proper consideration, to which Co-Conspirator #2 said, "Shhh. . . . Don't say that."

BB.     On or about September 18, 2019, Marketing Company #6 sent an email to **[2] KLAPP** and Co-Conspirator #2, copying a principal of Telemedicine Company #4 stating: "To confirm, [Marketing Company #6] is paying $50.00 up front per patient to [Telemedicine Company #4]. The balance of $75.00 will then be paid once the [sic] we receive reimbursement from said patient. [Telemedicine Company #4] will bill directly to Crestar and money from [Marketing Company #6]'s AP can be debited to satisfy invoice. . . . We plan on starting Asap in sending in a lot more swabs.";

CC.     On or about October 7, 2019, Co-Conspirator #2 sent an email to **[1] ALSHALABI** and **[2] KLAPP** with the subject line referencing Marketing Company #7 and stated that a patient called and said the patient "submitted his sample via someone going Door to Door marketing services." **[2] KLAPP** responded that he was terminating Marketing Company #7 immediately;

DD.     On or about October 7, 2019, **[1] ALSHALABI**, **[2] KLAPP** and Co-Conspirator #2 sent a letter of termination to the principal of Marketing Company #7;

EE.     On or about October 9, 2019, the principal of Marketing Company #7 sent a text message to **[2] KLAPP** stating "Would you mind sending an email or something simple just stating that we are indeed still working together, just so that the letter termination is no longer valid?" **[2] KLAPP** responded "Sure.";

FF.     On or about October 14, 2019, the principal of Marketing Company #8 sent an email to **[1] ALSHALABI** and **[2] KLAPP** noting that several of their tests, which were for Medicare beneficiaries, should have been paid to Crestar "many months ago." The email went on to state "Where is our money? Our contract is predicated on a % of the amount received. All we get is a 'form' from [Co-Conspirator #2] showing what he states Crestar was paid and not an actual report from Medicare/Medicaid. We are entitled to full disclosure because our income is based on this report. . . . We believe Crestar has been paid on these and Crestar has our money. . . . I will contact CMS, Medicare, Novitas and the FBI . . . . We want our money and we want it now! We are through being the nice guys. We have Agents who are losing their homes and being evicted from their apartments because of this.";

GG.     On or about October 22, 2019, the principal of Marketing Company #7 sent a text message to **[1] ALSHALABI**, stating "Fadel just confirming payment will be submitted today or tomorrow? Will that be a wire or ach? Thanks in advance!" **[1] ALSHALABI** responded: "Payment will be sent tomorrow."; and

HH.     On or about the dates below, in the Middle District of Tennessee, and each constituting a separate overt act, **[1] ALSHALABI** and **[2] KLAPP** directly or indirectly made payments to the Marketing Companies as described below, in exchange for the referral of Medicare and Medicaid beneficiaries for genetic testing:

| Crestar Labs Bank Account | On or About Date of Payment | Amount | Recipient |
|---|---|---|---|
| Suntrust x6074 | 5/16/2018 | $31,670.16 | Marketing Company #2 |

| | | | |
|---|---|---|---|
| Suntrust x6074 | 2/26/2019 | $85,792.33 | Marketing Company #4 |
| Suntrust x6074 | 5/08/2019 | 10,000.00 | Genetix |
| Suntrust x6074 | 5/08/2019 | 10,000.00 | Genetix |
| Suntrust x6074 | 5/09/2019 | 30,000.00 | Genetix |
| Suntrust x6074 | 7/11/2019 | $7,500 | Marketing Company #8 |
| JPMorgan Chase x0839 | 8/05/2019 | $70,000 | Marketing Company #3 |
| Suntrust x6074 | 8/16/2019 | $25,000 | Marketing Company #9 |
| Suntrust x6074 | 8/16/2019 | $17,663.82 | Marketing Company #6 |
| Suntrust x6074 | 8/19/2019 | $4,103.58 | Marketing Company #5 |
| JPMorgan Chase x0839 | 8/30/2019 | $70,000 | Genetix |
| Suntrust x6074 | 10/25/2019 | $4,011.90 | Marketing Company #10 |
| Suntrust x6074 | 11/14/2019 | $240,988.28 | Marketing Company #7 |

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FOURTEEN

68.     Paragraphs 1 through 67 are re-alleged and incorporated by reference as though fully set forth herein.

69.     On or about each date listed below, in the Middle District of Tennessee, **[1] ALSHALABI** and **[2] KLAPP** knowingly and willfully offered and paid any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid:

| Count | On or About Date of Payment | Crestar Labs Bank Account | Amount | Recipient |
|-------|------------------------------|----------------------------|--------|-----------|
| 2 | 5/16/2018 | Suntrust x6074 | $31,670.16 | Marketing Company #2 |
| 3 | 2/26/2019 | Suntrust x6074 | $85,792.33 | Marketing Company #4 |
| 4 | 5/08/2019 | Suntrust x6074 | 10,000.00 | Genetix |
| 5 | 5/08/2019 | Suntrust x6074 | 10,000.00 | Genetix |
| 6 | 5/09/2019 | Suntrust x6074 | 30,000.00 | Genetix |
| 7 | 7/11/2019 | Suntrust x6074 | $7,500.00 | Marketing Company #8 |
| 8 | 8/05/2019 | JPMorgan Chase x0839 | $70,000.00 | Marketing Company #3 |

| Count | On or About Date of Payment | Crestar Labs Bank Account | Amount | Recipient |
|-------|------------------------------|---------------------------|--------|-----------|
| 9 | 8/16/2019 | Suntrust x6074 | $25,000.00 | Marketing Company #9 |
| 10 | 8/16/2019 | Suntrust x6074 | $17,663.82 | Marketing Company #6 |
| 11 | 8/19/2019 | Suntrust x6074 | $4,103.58 | Marketing Company #5 |
| 12 | 8/30/2019 | JPMorgan Chase x0839 | $70,000.00 | Genetix |
| 13 | 10/25/2019 | Suntrust x6074 | $4,011.90 | Marketing Company #10 |
| 14 | 11/14/2019 | Suntrust x6074 | $240,988.28 | Marketing Company #7 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), and Title 18, United States Code, Section 2.

## COUNTS FIFTEEN THROUGH EIGHTEEN

70.     Paragraphs 1 through 69 are re-alleged and incorporated by reference as though fully set forth herein.

71.     On or about each date listed below, in the Middle District of Tennessee, and elsewhere, **[3] CHASTAIN** knowingly and willfully solicited and received any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing

of any item or service for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Medicaid:

| Count | On or About Date Payment Received | Crestar Labs Sender Bank Account | Amount | Genetix Received Bank Account |
|---|---|---|---|---|
| 15 | 5/08/2019 | Suntrust x6074 | 10,000.00 | Suntrust x2147 |
| 16 | 5/08/2019 | Suntrust x6074 | 10,000.00 | Suntrust x2147 |
| 17 | 5/13/2019 | Suntrust x6074 | 30,000.00 | Suntrust x2147 |
| 18 | 8/30/2019 | JPMorgan Chase x0839 | $70,000.00 | Suntrust x2147 |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), and Title 18, United States Code, Section 2.

## **COUNT NINETEEN**

72.     Paragraphs 1 through 71 are re-alleged and incorporated by reference as though fully set forth herein.

73.     From in or about July 2017 and continuing through in or about February 2020, in the Middle District of Tennessee and elsewhere, **[1] ALSHALABI**, **[2] KLAPP**, and **[3] CHASTAIN** did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody

and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

74. It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things:

    a. paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, so that Crestar Labs could bill Medicare for genetic tests, without regard to whether the beneficiaries needed the test;

    b. paying or causing the payment of kickbacks to telemedicine companies in exchange for the ordering and arranging for the ordering of genetic tests for Medicare beneficiaries, without regard to the medical necessity for the prescribed genetic tests;

    c. submitting and causing the submission of false and fraudulent claims to Medicare through Crestar Labs and other laboratories for genetic tests that were not medically necessary and not eligible for reimbursement;

    d. concealing the submission of false and fraudulent claims to Medicare; and

    e. diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

75. The Manner and Means section of Count One of this Superseding Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of how the co-conspirators sought to accomplish the purpose of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWENTY THROUGH TWENTY-FIVE

76. Paragraphs 1 through 75 are re-alleged and incorporated by reference as though fully set forth herein.

77. From in or about July 2017 and continuing through in or about February 2020, in the Middle District of Tennessee and elsewhere, **[1] ALSHALABI**, **[2] KLAPP**, and **[3] CHASTAIN** in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program.

78. It was the general purpose of the scheme and artifice that **[1] ALSHALABI**, **[2] KLAPP**, and **[3] CHASTAIN**, aided and abetted by others, unlawfully enriched themselves by, among other things:

    a. paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, so that Crestar Labs could bill Medicare for genetic tests without regard to whether the beneficiaries needed the test;

    b. paying or causing the payment of kickbacks to telemedicine companies in exchange for the ordering and arranging for the ordering of genetic tests for Medicare beneficiaries, without regard to the medical necessity for the prescribed genetic tests;

c. submitting and causing the submission of false and fraudulent claims to Medicare through Crestar Labs and other laboratories for genetic tests that were not medically necessary and not eligible for reimbursement;

d. concealing the submission of false and fraudulent claims to Medicare; and

e. diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

79. In furtherance of the scheme, as described below, the defendants submitted, or caused to be submitted, to Medicare, false and fraudulent claims for genetic testing, representing that the services were medically necessary, eligible for reimbursement, and provided to Medicare beneficiaries as claimed:

| Count | Defendants | Medicare Beneficiary | Ordering Provider | Claim On or About Date | Claim Control Number | Approx. Amt. Billed to Medicare |
|-------|-----------|---------------------|-------------------|------------------------|---------------------|-------------------------------|
| 20 | [1] ALSHALABI, [2] KLAPP, [3] CHASTAIN | M.W. | S.A. | 6/17/2019 | 691019168745470 | $11,845.10 |
| 21 | [1] ALSHALABI, [2] KLAPP, [3] CHASTAIN | B.K. | A.R. | 6/18/2019 | 691019169559920 | $6,974.04 |
| 22 | [1] ALSHALABI, [2] KLAPP | E.J. | D.G. | 6/26/2019 | 699619177600032 | $8,105.95 |
| 23 | [1] ALSHALABI, [2] KLAPP | J.K. | J.A. | 6/26/2019 | 699619177600085 | $8,105.95 |
| 24 | [1] ALSHALABI, [2] KLAPP, [3] CHASTAIN | R.S. | C.M. | 8/7/2019 | 452919219276090 | $16,269.94 |
| 25 | [1] ALSHALABI, [2] KLAPP, [3] CHASTAIN | S.S. | C.M. | 8/23/2019 | 160219235345260 | $1,681.18 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## FORFEITURE ALLEGATION

80.     The allegations of this information are re-alleged and incorporated by reference as though fully set forth herein for purposes of alleging forfeiture to the United States of certain property in which the defendant has an interest.

81.     Upon conviction of any count of the Superseding Indictment, **[1] ALSHALABI, [2] KLAPP**, and **[3] CHASTAIN** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

82.     The property subject to forfeiture includes, but is not limited to, the sum of money equal in value to the gross proceeds traceable to the commission of the violation alleged in this Information, which the United States will seek as a forfeiture money judgment as part of each defendants' sentence.

83.     If any of the above-described forfeitable property, as a result of any act or omission of **[1] ALSHALABI, [2] KLAPP**, and/or **[3] CHASTAIN**:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of **[1] ALSHALABI**, **[2] KLAPP**, and/or **[3] CHASTAIN**.

A TRUE BILL

██████████████

FOREPERSON

MARY JANE STEWART
ACTING UNITED STATES ATTORNEY

SARAH K. BOGNI
ROBERT S. LEVINE
ASSISTANT UNITED STATES ATTORNEYS